The next case is number 24-1444 Hector Tepan Lopez v. Atty Gen Lee Jekyll Good morning, your honors. I may please report Robert Jekyll, Legal Service of New Jersey, counsel for petitioner. I request two minutes for rebuttal. Granted. Your honors, after Mr. Tepan was baptized and joined his evangelical church in Quito, he felt called by his faith to preach his religion to youth in his neighborhood and encourage them to stop using drugs. This drew the attention of members of the Lobos gang. We know the facts, but help me with the whole issue here in terms of the centrality and the mixed mode of inquiry. I'm sorry, say that again. The mixed mode of inquiry and the centrality of the religious belief. Yes, so I'll just go straight to that then. So the IJ's findings were first, yes, that he was persecuted, that the gang members knew that he was preaching to youth in his neighborhood, and that they told him to stop preaching while they were attacking him. But the agency still reached an erroneous legal conclusion that his religion was not a central reason for his persecution. So there are three issues before this court on appeal. I mean, isn't the question that what test do we apply and who's interpreting the test under Natashemi? However, if I'm pronouncing it correctly, who's interpreting it correctly? So the test is the at least one central reason test. Right. A central reason, I guess, whatever. A central reason. Right. Which implies that there can be more than one central reason. And in fact, in the history of legislative history, the language was changed from the central motive to at least one central reason. So it's understood there are mixed motives. But you can see if we were just having some offhand discussion. Sure. If somebody said a central reason and somebody were to say, well, in this case, whether the religion thing is really. Distantly in the background. It could be right. And so therefore, it wouldn't be a central reason, it wouldn't be essential or a principal reason. I'm speaking theoretically now. Theoretically, if one were to find that religion were in the background, separate from the IJ's findings in this matter. Even though it was a motivation, but it was in the background as a motivation. Right. Well, so two things as to that. First, this court has made clear in the Natashemi there is no hierarchy of motivations looked at once. The protected ground is understood to be not incidental, tangential or superficial. The IJ and the BIA both applied different tests in that. The IJ first to your question about motivation. The IJ looked towards Mr. Tipon's motivation for his actions, but not towards what the gang said to Mr. Tipon. So and I know we've glossed over the facts a little, but I want to point to a few of the incidents here. The first encounter with the gangs in December of 2020, they robbed him, they beat him on the head, they pistol whipped him. And according to his uncontroverted, incredible testimony, they said to him that I was speaking about the word of God. The IJ. And what was the date on that? December 2020. In the second encounter, January 2021, they tell him, keep on preaching and we'll see what happens. And then they shot him. And again, the IJ's findings on this were they say that he was preaching about religion and that the respondent had caused him. All right. And if he had been preaching about religion and it doubled the local consumption of hallucinogenic drugs, it's your argument that he would have been shot and persecuted? No. Right. And that's what the agency knows or knew that he was motivated by his faith. There's no doubt about that. But the agency also said that this was all about drug profits. And it didn't matter whether he was talking about religion, soccer, politics. All that mattered were the drug profits. And that's why I asked you the hypothetical, because I think that if his preaching about God had resulted in an increase in local consumption of drugs, they would have been very happy with him. So really, it doesn't have anything to do with about his religious belief or his preaching. It has to do with the drug trade and the loss of profits. And they even said, I think they put a number of ten thousand dollars they wanted from him for lost profits. We'll get to that in a moment. That actually came much later, by the way. That was the fifth encounter. Almost a year later, we're having multiple times told him to stop preaching. And I believe he may have said, OK, now you owe us ten grand. But that's that was frankly, if their concern had been from the top been that monetary reason. And this cuts the substantial evidence question less than the legal standard. But I just on that point, if the concern by the gangs the whole time had been you're costing us a lot of money, you owe us this money. They might have said that on the first or second or even the third encounter and not the fifth, which, again, is November 2021, while the first was in December 20. And in those intervening times, they kidnapped him, beat him, shot him, stabbed him. Also, in the intervening times of April 21, at least according to his affidavit, he stopped preaching about the evils of drugs. That's correct. So did he continue to stop after April 21? He just no longer preached about the evils of drugs. He stopped preaching altogether. Altogether. He was trying to keep a low profile at this point. He continued to preach, but not about drugs. No, he did not preach at all. I assume his religious beliefs did not change. His religious beliefs did not change. But I think their actions against him took a toll. Yeah, what I'm trying to get at, it seems to me you have one scenario. This goes to the whole issue here in terms of centrality of belief and mixed motives. If one's religious beliefs are so intertwined and explicably intertwined with one's conduct, such that the conduct is driven by one's perception of what God requires them to do. That's one scenario. And it seems to me in that scenario, you cannot separate the conduct from the belief. I agree. I think that's really where you're focusing your argument. That is absolutely correct. Those are the four-circuit line of cases, starting with Alvarez-Lagos and Perez-Vazquez. Thank goodness we're not in Georgia. If, however, the scenario is, well, look, these folks are telling me they're going to continue to do me harm if I continue to talk about, if I continue to preach, I think I'm going to back off this preaching. I'll still do my communion, but I'm not walking down the street talking about God anymore. Then it seems to me that in terms of the way the BIA saw this case, it may be much closer. I'm not playing there very well. But the extent that one's conduct is a personal manifestation of how that individual believes he or she must conduct themselves because of their beliefs, that's one scenario. But if that conduct is so intertwined with belief that the person feels they have no choice, it seems to me that's another scenario. I can see by the look on your face that I'm doing nothing but confusing you. I think I understand what you're saying, and I hope I answered it. That's what I'm trying to get to. You asked the question of centrality, and it sounds like, are you asking the question of, must he have continued to preach even after getting shot and stabbed for it to be central? Well, I'm trying not to ask that question. Because I would say no. Okay, I know you wouldn't, so I'm trying not to ask that question. If we have a scenario where conduct is not tangential to the belief, and the board focuses on not the belief but the conduct, to me that's not the same scenario if we have a scenario where conduct is so intertwined with belief that it offends one's belief to no longer engage in the conduct. So I'll say what he said, but his credible and controversial testimony says about that. First, that he was, when he converted to this evangelical church, he was told, as in the book of James, faith without works is as death. And so he was compelled by his church to take action in his community. But not any specific action. Not any specific action, but the action he understood that he was called to do was to help youth in his neighborhood who were addicted to drugs. And his actions were also, and I think this is where we take issue with the BIA's characterization. The BIA says if he had done the same actions but for, say, public health motivations, the gang would have gone after him the same. He didn't take generic anti-drug actions. He specifically preached. He went to individuals one-on-one, personally talked to them about the word of God, what God wanted of them for their lives. Right, but that's his motivation. That's not the gang's motivation. But that's his action that they took issue with. So I would point this court first to, I would say, Chica's Machado, which is the Fourth Circuit case. All right, just slow down a little bit because that's interesting what you just said. The action is what they took issue with. But the action was that he was apparently causing some of the clients to stop buying drugs or buy fewer drugs, right? Right. The problem from the gang's perspective wasn't that he's convincing all the local youth to go to church or to believe in God or anything like that. It was all about the effect on their business. That was the IJ's interpretation. And what's wrong with that? I mean, there seems to be substantial evidence for that. Sure, and we are arguing that even if there is substantial evidence for that, under the inevitably intertwined test, his religion is still a central reason. Because the gang said, stop preaching. They attacked him for preaching. They didn't say, stop with the anti-drug part of your preaching. They said, stop preaching. And they forced him to stop preaching. I think we're all trying to get at the same thing through different hypotheticals.  This hypothetical may not do a better job, but it goes to what Judge Hardman, I think, asked you. Let's assume that he continued to preach.  And the folks on the street heard his message. They started going to church. And the minister there was so bad, so boring, the only way they could sit through it was to get high. So the drug profit soared. Because they believed what he was saying, but they knew that, hey, if I'm going to deal with this guy Sunday morning, I've got to get my load on. I've got to get high. So the gang wouldn't have any problem with that, I would assume. We can assume, but the record does not support that, though. And that does come to the attention. They would have encouraged him to preach. Had his preaching positively impacted the drug sales? I think that, yes, there are circumstances under which the same actions would have had different results, would have had a different end for the gang. But I would point this court first to the BIA's foundational case in the matter of Acosta, where they say that the requirement of persecution on a counterprotected ground refers not to the ultimate political end or the ultimate end that may be served by the persecution, but to the belief held by an individual that caused him to be the object of the persecution. And at the end of the day, Mr. Tipon was not preaching religion and encouraging people to get high. And he wasn't preaching religion or preaching – not even preaching at all. He wasn't doing generic public health-focused anti-drug activism. He was doing specific, personal, one-on-one mentoring and preaching to individuals. And I want to point to Judge Hardiman's earlier question about $10,000. If you look in the record about what Mr. Tipon was doing, I believe there's a declaration from someone he worked with. This wasn't large-scale. He wasn't setting up a neighborhood church. He was – this was really individual, personal attention. It does not seem likely that this action was causing $10,000 of lost profits. That number seems to come later and seems vastly disproportionate to the actions he undertook. In fact, in general, I would – we haven't touched on the other – He's assuming that it's a dollar-for-dollar recouping of – What's that? He's assuming they would have done a dollar-for-dollar recouping of the loss. I'm saying this is wildly disproportionate. Well, they've got to pay the guys that are pulling his fingernails out and shooting him. You know, it's expensive. It's hard work. I'm most interested in what tests should we apply with respect to the persecution here and also under the convention. Sure. And would you address what tests the BIA applied? Sure. And what tests you think should have been applied based on our precedent? Or if it's not our precedent, what other courts have done?  I might – is it okay if I take those questions in reverse order?  Okay. So the test this court should apply is effectively the Gahneman and Deschamais tests that there's no hierarchy of reasons, but that a central ground not be incidental, tangential, or superficial. But central ground is still there.  I'm sorry, say that again? Central ground is still a factor, if not the controlling factor. Right. And I think that the Fourth Circuit's language in Perez-Vazquez that asked the question, why this person and not that person, and the language of why – whether a central ground is inevitably intertwined with. I think in this case, the inevitable intertwining is apparent when they keep saying to him, stop preaching or we'll see what happens when you preach and then they shoot him. I would also point this court to Chico Machado, the other Fourth Circuit case we cite, because I think that shows. You want us to follow the Fourth Circuit. What's that? You want us to follow the Fourth Circuit. I think that the Fourth Circuit's principles laid out.  The answer is yes, in part because the Fourth Circuit test is in line with the principles this court has stated in Gahneman and Deschamais, but shows other situations where there is a more explicit monetary reason as well and shows how that monetary reason does not overwhelm any of the protected grounds. I would actually point this court also to Saban Cash, which I believe members of this panel heard, where persecution was found on account of indigenous ethnicity. And in that case, the individual was targeted for recruitment by the gang because he was indigenous, not because they held any initial particular animosity towards other indigenous people, but because I think the words they were going to use him as bait. In other words, he's someone who's expendable, so we want to bring him in. It's the same concept that you cited in the Chico's case. Yes, exactly. In other words, you want to get somebody who was religious in your group because that gives you a good face for the activities that you're about. Right. So you may still have an ultimate monetary goal, but the reason you've chosen to attack this person is because of the protected ground. Now, the test, Judge Hardiman, you asked what test the BIA applied. So the BIA did not cite this court's cases to Gahneman or Deschamais, but instead focused when attacking or when addressing our mixed motives argument, cited to a recent precedental decision by the BIA matter of MRMS, which is currently before the Tenth Circuit. The argument was yesterday. And MRMS has a test that is contrary to this court's holdings in Deschamais and Gahneman, which is if a persecutor, and it was specifically for family members, but if a persecutor is targeting members of a certain family in that case, as a means of achieving some other ultimate goal, then the protected ground is subordinate to the other ultimate goal and not one central reason. So MRS, in effect, is going to disagree with the Fourth Circuit approach. And with the Third Circuit because MRMS states that Deschamais rejected that subordinate language. So when the BIA. This thing with the Third Circuit, are you thinking about Saban-Kash? I'm sorry, say it again, Your Honor. It's inconsistent with our precedents. You're thinking specifically about Saban-Kash. That MRMS cited Deschamais and said Deschamais has rejected our reasoning here. So that's the test. Judge Amber, you also asked about. Before you move on to that, I'm not sure I'm accepting your argument that the Fourth Circuit's view of one central reason or a central reason is in harmony with our precedents. I feel like our precedents have a little more teeth on that. Can you address my concern? Are you referring to Ghanem here or is the general? We've got several precedents. I guess I'd put it this way. It seems to me like the Fourth Circuit's got a lower standard for one central reason than we do. I think if you were to look to start with Ghanem where this court said that even if there were personal conflicts, that that does not mean that a protected ground is not a central reason. I think that does line up with the Fourth Circuit's reasoning here. And I think that Saban Cash is quite similar in its fact pattern to Chico's Machado. So there were differences, but they both involved gang recruitment, recruitment which understood had an ultimate monetary goal. The individual they targeted, they targeted because of a protected ground. So I think if you look at those two cases specifically, you'll find a lot of common ground. Okay. Before you sit down. Go ahead. The cat issue, I mean it seems to me like your case is really an asylum and withholding case, not a cat case. And the reason I say that is because peculiarly your client suffered grievous injuries and a variety of attacks and apparently never reported any of them to the police. And also, I couldn't see anything in the record that he even sought medical treatment. So I can address both of those. There's a reason for both of those, which is the gang, and I believe this is on page AR-259, threatened him and said, if you go to the cops, you will know. Well, I understand that. And he testified he thinks that the police are corrupt in Ecuador. He testified that. Right. And the country conditions evidence also supports this. And you don't get, you're stabbed, you're shot, you get your fingernail pulled out, you don't get medical treatment?  He did home remedies. He had friends of his get supplies and treat it. Okay. He is pretty badly scarred as a result, frankly. All right. And how does that show us in any way that the government of Ecuador is going to acquiesce in this sort of treatment? How does? I mean, it seems, it just seems to be the inverse of what we normally see in a cat claim where, you know, people go to the police, they report it, and nothing happens. Here he doesn't even report it. So how can we draw an inference that the government of Ecuador is unwilling or unable to help him when he doesn't even give them a chance to do so? So this court in Quechua and Villegas has stated that country conditions on their own can establish cat. And the country conditions in this case include articles that show that members, Iranian members of the military, it said the gangs who are very powerful in Ecuador at this point, have declared war on the state at the time of this individual. Yeah, they did that in El Salvador, too, and now they're all in jail. And in Ecuador, the government has taken draconian measures, including suspending a lot of civil liberties in order to crack down on gangs. It does, at least at the time that this record was compiled, it did not seem to have had an effect. In fact, between the filing of our- Well, it may not have had an effect. They may not be winning the war against the gangs. The government of Ecuador is fighting the gangs. But if they're unable, if there's inability to protect citizens from harm, it should be sufficient at this point. I would point this court to Quinteros. What happened in Ecuador- Inabilities mentioned on the first month or first six months of the war against the gangs. I mean, when should we measure inability? Doesn't the government deserve some time to try to get things under control? I would say the time to measure that would be at the time that the record was compiled and the case was before the IJ. And what do we know about that? At that time? Between the filing of the pre-hearing brief and the merits hearing itself, an anti-gang candidate for president was assassinated by gangs. The record? That is in the record, Your Honor. I believe it's tab Q. I'm not sure, but it is in the record. I can find it. There were numerous articles submitted in the record showing that members of gangs- Gangs are running their own candidates for office. Gangs have infiltrated the police and the military, including in Quito and in Guayaquil, which is the main port city. And a lot of this evidence was ignored by the IJ. But to your other question, I think it's dangerous to say, in a situation like the present one, well, he should have reported to the police because he had strong reason to believe that if he reported to the police, something even worse would happen to him. I wasn't trying to suggest he had to report it to the police. Sure. What I was suggesting is that by not reporting to the police, it substantially weakens his cackling. And I think my answer to that would be that the country conditions evidence then bolsters that. I know my time is overdue. I haven't really addressed the sufficiency of substantial evidence. If you could address the- back to what the test is. Sure. What part does Animus play or not play in the test that you- Right. So we argue that Animus has no specific role. Because? Because it's partially because this court has many times in the past found nexus without looking to Animus. Animus is useful. Animus could be looked at as evidence that bolsters a claim, but it's not an element of nexus. I have no further questions. Okay. All right. Thank you. We'll hear your rebuttal. Yes. Thank you, Mr. Jackal. Let's hear from Mr. Verby. Good morning. May it please the Court. Russ Verby, on behalf of the Acting Attorney General. The petitioner's claim that the agency erred in its nexus determination relies not on what the board actually said or what the board actually cited. The petitioner faults the board for relying on matter of MRMS, which relied on matter of JVN. And there's quoted language in matter of MRMS coming from JVN that in a mixed motive case, the protected ground cannot be subordinate to another protected ground. And this court has set that language aside and not a sheamen. But what we have to keep in mind are three important points. First, in matter of MRMS, even when quoting matter of JVN and the subordinate language, the BIA did drop a footnote noting not a sheamen's disagreement. Second, in the petitioner's case, even though the board does cite matter of MRMS, no mention is made of the subordinate language. It's not relied on. It's not cited by the board in the petitioner's case. So how would you suggest that the test, what do you think the test currently is in this circuit? I think the test in this circuit comes from not a sheamen and from failing. And basically, you cannot have any sort of dominance-based test. And the question becomes whether the proffered protected characteristic was an essential or a principal motivator for the persecution. That's the simplest way to look at the test. Isn't there another way of rewording dominance? Because it can't be dominant, but it's got to be essential or principal. Isn't that the same thing? Well, essential doesn't always mean principal or dominant. If I'm going to bake a loaf of bread, by weight and by volume, the least gradient in there is going to be yeast. But I can't get the dough to rise and I can't make the bread be leavened without it. So while it may not be dominant, it may not be overwhelming, it may not be considerably more measurable, it certainly is essential. That's how I'd put that. And I think the third point that needs to be mentioned. And in connection with the animus part of what role does that not play. Oh, certainly. I think if you look at the matter of MRMS, if you look at this course decision in gaming, Shehu, Phalen, all of them talk about animus being a relevant consideration. And I guarantee you if there was evidence of animus towards evangelical Christians, or if there was animus towards, let's say, ethnic minorities in this case, the petitioner would be trumpeting that evidence. But there is. The other side said it could be useful, but it's not an element. Is that correct? Exactly right. I think you have to kind of divide the asylum world into two different types of cases. There's one in the overwhelming pool where animus is a relevant consideration. Because human nature and common sense tells us that humans harm other humans because of hatred and animus. There is a much smaller pool, and it's what the board mentions as a benign reason for the harm, or what I would like to think of misguided benevolence. Let's say that's female genital mutilation. Or putting a person into some sort of religious or political re-education camp that has harsh conditions to bring their beliefs more in line with an accepted orthodoxy. We're not doing this because we hate you. We're doing this for your own good. We love you. That's a very rare type of case. And that type of case, what the petitioner really wants is this court to take that rare type of case and apply it with a broad brush. But animus is a relevant consideration. And like I said, the last part about the way the board approached this case when it came to this. Is animus not required under the board's own precedent in Kasinga? I wouldn't say it's required, but it is a consideration. Or is it not required in Kasinga? And if your claim is based on hatred, showing proof of animus can only support your claim. Kasinga wasn't in, I think it was in a bank board decision, was it not? Yes, it was. Okay. So if we take a look at, I just, one last point, though, that when the board cited MRMS in this case, like I said, it didn't cite the subordinate language. What it did cite it for was, at most, and quoted, the motive proffered can't be at most incidental or tangential to a more common motive, such as protecting a criminal enterprise, which exactly would happen in this case. So what we have is the board using a proper standard that leads us to substantial evidence. With respect to religious belief and ethnicity, we'll take those together. Clearly, the petitioner's spurious convictions led him to take action. But the motivation, as we've discussed earlier in the hearing, is not measured from his perspective. It's measured from the tormentor's perspective. What were their motives? And now in the first and second encounters, the Lobos members did use ethnic slurs and complain about the petitioner spreading the word of God. But by that third encounter, the essential motivator or an essential motivator for their actions became into focus, and it came out of their mouths. You're impacting our drug trade. And that continued through the fourth and the fifth encounters. And then by the sixth encounter, we had the demand for $10,000 as compensation for lost drug trade. That was in November? Excuse me, Your Honor? That was November? Yes, sir. I believe the first demand for $10,000 was November 2021, Your Honor. So I think we have plenty of evidence there that the drug trade and protecting the drug trade and the profits was an essential motivator. If we look at the alleged anti-gang political opinion, the petitioner does not rely on an imputed opinion, so he sort of hemmed himself into having to show, one, that he had the opinion, two, that he expressed the opinion, and three, that his tormentors were aware of the opinion. We know from his testimony that he was telling people, don't use drugs, pursue more positive activities such as sports. He wasn't saying, don't join gangs, stay away from gangs, that sort of thing. He was just saying, let's do sports, let's not do drugs. So it's hard to make a leap from that. I'm going to judge Hardeman's hypothesis. Had he said, don't use drugs, it's medicinally really bad for you, you need to start smoking weed instead. Assuming that they weren't selling weed, which is probably far-fetched, his submission is that wouldn't have caused any problem. Or if his religious beliefs were, say, you should use peyote, and that increased their drug profits, we wouldn't be standing here probably. So I think the anti-drug gang and the anti-gang opinion, Profford Protected Ground just isn't going to make it. Turning to the Convention of Torture claim, the petitioner did clear the hurdle on potential for future torture, but his claim came up short with regard to the question of acquiescence. Judge Ambrose, if we look to the Myree decision, when it comes to this type of situation, we have to look at how public officials will likely react in response to the harm feared, and whether that response would be acquiescence. We know in this case that the petitioner didn't seek out help, so it's kind of hard for the immigration judge and agency to gauge what the likely response would be. Jack was saying the test is unwilling for unable. Didn't we say in Quinteros that results can matter? Results can matter. But the problem is, unable or unwilling, I would think you kind of have to keep more in the asylum withholding context. In this, it's acquiescence. That's the term. Would they acquiesce to harm committed by third parties? They can try to protect a person. That's not acquiescence. Acquiescence is, yeah, have at it. Or acquiescence is, I'm just going to pretend I don't see this. But if they're unable to, that gets you to the same point as acquiescence does. Well, there are a lot of circuit courts, and I don't have the cases slide in my head right now, have not said that failure on the part of the government equals acquiescence. Acquiescence is a different thing, like I said. Acquiescence is trying to do something. You may not get to a great end result. But that's not what grounds for failure. But doesn't the statute itself say unable or unwilling to? In the asylum and withholding context, yes. And in this context, it's more acquiescence that is the key, as opposed to what the outcomes are. And the judge in this case looked at both what they were doing down in Ecuador, which was declaring a state of emergency, putting together gang task forces, going after corrupt officials, changing the rules for the use of force to allow the police to better meet the threat posed by the gang. All those show that the likely reaction from the petitioner, if the petitioner complained, would have been positive and that they would have taken some steps to try and protect this petitioner. The outcome of that would be tough to gauge. Are you aware of any successful petitioners who argued acquiescence in cases where they never reported anything to the authorities? Off the top of my head, Your Honor, and I'm not saying one way or the other because I don't want to mislead the court. I'm just asking if you're aware. I'm going to ask Mr. Packle the same question, but he has a heads up on it. I'm sure he's got the whistle out right now. If there are really no further questions from the court? No. Attorney General just asked the petition be denied. Thank you very much, Mr. Verby. Mr. Jekyll, would you mind starting with the question I just asked so I don't forget it? The question about whether there has been— I'm just curious. Are there any reported cases where petitioners have succeeded on a cat claim on the argument that the government was unwilling or unable when the facts of the case were that the petitioner never brought to the local authorities? I don't have a relevant case on hand, but I will say there are often cat claims raised that pass the one-year bar concerning changed country conditions in which things have changed since the applicant has left the country for the worse. So, for instance, you often see that in situations where there's a civil war. I understand that, but that's— But that does answer— I'm just—I would hesitate for us to be the first court to ever say that a petitioner who never saw fit to tell the police that he had been the victim of crime could win a cat claim. Maybe a thought would be to have both counsel take a look at this and submit 28-J letters.  Because it's important. I think Mr. Jackley would agree to that. I'm not saying this is the case. I'm not sure it is. But the record evidence could be so strong in terms of country reports that you could meet that burden even though no police report filed. In fact, you then argue that there's a reason for not filing a police report.  Many a public police report is a death warrant. I would agree with that. Yes, and I believe I argued that as well. Right. So, does that answer your question? Or at least will it entail— Yeah, no, that does. That does. I think that's sort of obvious. Judge McKee makes a good point that if the government of a country— basically a failed state argument. Right. If the government is working in concert with criminal enterprises, then it would be crazy for the victim of crime to report what had been done.  If I can address a few of the points that the respondent made briefly. I know I'm out of time already. But he did mention animus. I think there's a fairly, frankly, broad general agreement that animus can be used as evidence to help understand. I would add a third category to the category that Mr. Verby mentioned, which I think is partly where this case holds, which is where there's a vulnerable population who can be exploited. Right. So, in this present case, they went after—and we'll talk about his race and ethnicity in a moment. I think that was also raised. But there may not necessarily be animus towards evangelical Christians, but they understood, among other things, they could attack them without consequence. And also, as in Sabancash and as in Chico Machado, he was standing in their way as it was. So, again, animus is useful but not a requirement. I would also just clarify what the respondent mentioned concerning MRMS and its function here. Because our brief does focus on the BIA's decision to quote MRMS. MRMS was cited to reject our mixed motives arguments. And in MRMS, MRMS compared Hernanez-Avalos, which is a Fourth Circuit case that is sort of the antecedent for the cases we cited, and it does deal with family-based persecution, with the Tenth Circuit's decision in Ariana Racines, which requires both specific animus and that the protected ground not be subordinate. And the BIA in MRMS stated, in our view, the Tenth Circuit approach is the proper way to look at this. So, and given that that was the site that the BIA relied on for its rejection of our mixed motives argument, I would say that it's – The BIA specifically cited our opinion in Ndeichame, though, so I don't understand how the BIA's reference to MRMS somehow polluted its decision when it specifically adverted to our precedent on the matter. Do you mean that the BIA cited to Ndeichame in the present case?  I don't see that site before me. Or maybe it was the IJ. It might have been. Let me find it. Because the BIA, its sole legal analysis of our mixed motives argument was this footnote and said, well, those arguments have been rejected by MRMS. So if they've been rejected by MRMS, we have to look at what MRMS said about mixed motives. I would also briefly just mention the race and ethnicity protected grounds, I apologize, because it wasn't raised in my opening, but because you mentioned them. The evidence shows a series of encounters where the gang, every time, used ethnic slurs against Mr. Teapot as they were beating him. We argue that that consistent use of the term they used was langa, which is a, I believe it's a Quito-specific ethnic slur referring to dark-skinned people of mixed heritage, primarily indigenous, who have moved to the city and have sort of made their way up in life. And it was used by the gangs when they were beating him. And as Mr. Teapot testified, the gang members who attacked him were all white. And again, referring to Sabancash, indigenous ethnicity can be inferred as a motivation for attack based on the statements made by assailants. We believe the consistent use of this ethnic slur while they were beating him and attacking him showed that, among other things, they were trying to put him in his place. Evidence on that is thinner than it is on his religion. If you're going to win on that, you're definitely going to win on the religion. I agree. And if you're going to lose on the religion, you're definitely going to lose on langa. There's a reason we started with religion, Your Honor. I don't think there's anything else raised that needs addressing at this point. All right. Thank you. Thank you very much. The case was very well argued by both sides. Thank you. It really was, Will. I'm going to commend both counsels. Really, a very, very good argument. Just both counsels really need to be commended on your preparation, your answering of our questions, your letting us ask the questions, which as you saw in the lobby, our appellate attorney allows us to do that. But my hat's off to both of you. I hope you both come back and see you again. I hope my boss is listening in. Enjoy blogging. Thank you. Will?